The next case today is UBS Financial Services, Inc. et al. v. Ass'n de Empleados del Estado Libre Asociado de Puerto Rico, Appeal Number 20-1237, and Ass'n de Empleados del Estado Libre Asociado de Puerto Rico v. UBS Financial Services, Inc. et al., Appeal Number 20-1238. Attorney Marks, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors. Daniel Marks for the appellant, Ayala. And may I please reserve two minutes for rebuttal? Yes. Thank you, Your Honor. This is no run-of-the-mill arbitration appeal. This case raises at least three novel legal questions about the review of arbitration decisions. First, the meaning of the evident partiality standard under the FAA, specifically in FINRA arbitrations before neutrals where the issue is the nondisclosure of a connection to a party. Second, the important role of the FINRA's strict disclosure rules in that evident partiality analysis. And third, the standard for waiver of evident partiality challenge based on nondisclosure. None of those questions have been definitively resolved by this Court, and this Court should finally resolve those questions and, in doing so, make clear how it reads the Supreme Court's critical decision in Commonwealth Codings, which has been the subject of a circuit split for decades and which this Court has never directly addressed. Now, to be clear, Ayala is not arguing for some kind of expansive review of arbitration awards. Ayala isn't asking this Court to review any legal or factual decisions made by the panel, only to make sure that the District Court fulfills its important role in post-award review under Section 10 of the FAA. Now, I'd like to start with the issue that UBS relies on most heavily for its claim that these issues are already well settled in this circuit, and that's the now almost 20-year-old decision in JCI Communications. Now, that case clearly was not a FINRA arbitration case. It was not an arbitration that was supposed to proceed in front of neutrals, as this one was. And more importantly, the alleged basis for the partiality in that case had nothing to do with nondisclosure. In fact, this Court distinguished Commonwealth Coding, a nondisclosure case, from JCI by pointing out that the alleged basis for possible partiality or bias in JCI was the very structure of the arbitration committee, which, of course, was dictated by the CBA in that case and was something that both parties, win or lose the arbitration, were well aware of and had agreed to in advance of any hearing. Now, the District Court correctly noted that that issue has never really been squarely resolved in this circuit. In other words, a standard for a nondisclosure case. JCI Communications was no such case. Now, let's jump ahead to Ortiz, a more recent case, and UBS points to Ortiz as an example of, well, we have applied JCI Communications in a FINRA case, and that's true. Ortiz is a FINRA case, but Ortiz doesn't answer any of the three questions that I've articulated for the Court today. Number one, it's primarily a case with a very detailed and rigorous discussion of whether look-through jurisdiction applies. Federal look-through jurisdiction applies to post-award remedies in the same way it does to motions to compel arbitration in the first place, and, the partiality in Ortiz is based on hearing conduct, and this happens all the time. Parties complain that, well, at the hearing, an arbitrator was mean to my side or interrupted my counsel or made comments on the record that I think showed bias against our arguments or our side. Those are issues that there's no dispute, both parties are aware of, and can bring to the panel's attention at the time. It's not an issue of an undisclosed connection that an arbitrator has to a party that someone only finds out about later. So, if the arbitrator didn't know of this connection, how did he have the capacity to be biased? So, it's a great question, Your Honor, and I think a couple of things. First of all, I think you could reasonably infer from the facts of this case, sort of the multiple overlapping constellation of connections between Mr. Ortiz and the financial service industry. Second, and more importantly, he should have known, and he should have known because the FAA and Commonwealth Codings and the FINRA rules all squarely place the obligation of investigating those kinds of potential issues and then disclosing them to the parties on the arbitrator. The idea is not to send parties scrambling in advance of an arbitration to find out what they can about the decision makers. It's for the to take on that duty, just as a lawyer would run a conflict check in a case. An arbitrator should take on the responsibility, and FINRA rules clearly require that they investigate their own potential connections to parties and disclose them promptly. I'd also add, Your Honor, and it doesn't directly answer your question, but I think it's a factor to put in the balance, is AILA definitely didn't know about these connections in advance. It was able to find out about them but I think it would be unfair, as UBS proposes, to sort of judge arbitrators under a kind of actual knowledge standard. Did they really know at the time they didn't make the disclosure, but impose on parties a constructive knowledge standard? In other words, if you could have known this before the arbitration hearing, then you're not entitled to raise it after the fact. Let me say another word just about the nature of the connections here because, of course, UBS wants to dismiss them as trivial, and I think they're not. I think they're not for a couple of reasons. Number one, we have multiple real and current connections between an arbitrator through his employers to a party in the case. These aren't speculative. It's not a one-off matter. These aren't things that happened many years ago. So these are the types of things you see in the case law. They're also not trivial in the sense that this court and other courts often use that word. For example, in JCI, the triviality is the fact that some of the employer-side arbitrators were people who worked in the same industry. In Ameriprise, which is a district court case UBS relies on, the issue is that the arbitrator had a particular general ... There was a general allegation about the arbitrator's expertise or practice area. Nothing about a connection to a party. Keystone, which they cite, is another case where the court refers to a single, brief, and unrepeated connection in the past through an arbitrator's spouse to the lawyers of a party. That's not what we're dealing with here, and there's really no question, and I think the district court was clear about the fact that had AILA known about the nature of these multiple connections between Mr. Ossimeth and UBS, it never would have agreed to have him decide a $70 in some senses in the eye of the party. There's no dispute that AILA would not have had this person decide its dispute had it known he had these multiple connections to UBS. Not trivial. What about the word attenuated? Attenuated in the sense that no reasonable person aware of these connections between the arbitrator and UBS could view them as a source of partiality, a source of bias. There does seem to be some force to the argument that there is an attenuation in relationships. It would really be a stretch, not reasonable, to argue that these relationships could be a source of partiality. How do you respond to that? There's always going to be a judgment call to be made about whether attenuation, remoteness, triviality, whatever words we use. There's always going to be a line-drawing issue. That's unavoidable. I think there's a couple things that influence a district court's analysis. Number one, the question that FINRA has amongst arbitration bodies, some of the most strict rules around disclosure. I think it really can't be argued that these kinds of connections aren't so attenuated that they wouldn't require disclosure under FINRA's rules. FINRA's instructions, its guide to arbitrators says, if you have any doubt, if there's any question, disclose the information to the parties. In some sense, you have to pull back and think about arbitration broadly again. This is why I urge the court to go back to Commonwealth Codings and finally tell litigants in this circuit what this court thinks it means. In Commonwealth Coding, in the famous concurrence by Justice White, he refers to a connection between an arbitrator and a party that's so insubstantial, these are his words, that the arbitrator is worried, if I even reveal this, it'll make it look like I'm biased because I'm conscious of it. Why should the parties, if I'm mentioning that there's disconnection, they're going to think that matters to me. What White says, joining the majority opinion of Justice Black is, that should be disclosed because the only way we make arbitration successful, the only way we fulfill the mandate of the FAA, and the only way we get party buy-in and ultimately reduce judicial involvement in arbitration is by establishing an atmosphere of frankness at the outset, atmosphere of frankness, that's his test. And I think in this case, it's not so attenuated, again, and there's no litmus test, there's no bright line I can articulate for your honor, but these connections are not so individual and attenuated that it wouldn't have contributed to the atmosphere of frankness in this case had Mr. Asimetha disclosed those to the parties in advance. Thank you, Counselor. At this time, sir, Mr. Marks, if you would please mute your audio and your video, and Attorney Furstenbaum, if you would unmute your device, and introduce yourself on the record, sir. Good morning, your honors. Ross Furstenbaum from WilmerHale on behalf of the Applese UBS entities. May it please the court. AILA, a multi-billion dollar financial institution in Puerto Rico is trying to overturn the result of a 10-day arbitration proceeding based on... Mr. Furstenbaum, Mr. Furstenbaum, under FINRA regulations, are these connections something that would require disclosure? Uh, no, your honor. First of all, as a legal question, the mere violation of the FINRA rules in and of itself cannot be the basis of vacater. The Supreme Court in Hall Street has made clear that the sole grounds for vacater are the statutory requirements, the relevant one here being evident partiality, not mere violation of the arbitral rules. But to answer your question, um, uh, there was no violation of the FINRA rules here. I think the... Why not? Because the standard that AILA points to, um, in rule 12-405-A, um, I believe it's, sorry, uh, C-3, um, that the relationship, um, I'm sorry, it's, uh, 2. Uh, there's no existing relationship, uh, or past relationship that is, quote, likely to affect impartiality or might reasonably create an appearance of partiality or bias. Again, the standard for vacater is greater, but the facts don't even meet this standard here. For Axiom, arbitrator Asimov did not do any work for UBS. He had no knowledge of the, of the fact that anyone at Axiom had ever done any work for UBS. The sole evidence in the record, uh, that shows, uh, that any UBS entity ever did work for Axiom was an overseas UBS entity in Europe that did some work long before this arbitration had occurred, um, uh, in an unrelated matter, uh, swap transactions that had nothing to do with the Puerto Rico bonds at issue in this case. What, what, what exactly is it a, uh, probably, I mean, there was some debate about what is Axiom. It's not a law firm. It's, it's a, sounds like it provides contract work. What lawyers associated with Axiom can be hired to do contract work for different entities. Is that basically what Axiom is? That, that's exactly right, uh, your honor. I think of it as a temp agency for lawyers where Asimov, um, uh, has a work for a particular entity, um, in this case, cyber, um, and he has no, uh, insight into, uh, what other client engagements Axiom had with other clients, um, uh, years ago overseas. And so through his association with Axiom, how did he do any work for UBS? I mean, he did not. No. Okay. And, and so to, to finish the answer that you let nowhere in its brief and nowhere in, in counsel's argument, do they tie these attenuated connections and attenuated is exactly the word, um, uh, to actual, an actual theory of partiality. There's no reason why, even if Arbitrator Asimov did discover the fact that Axiom had years before the arbitration done some work for an overseas UBS affiliate, there's no reason for Arbitrator Asimov to conclude that renders me partial such that I want to be on this panel or such that I want UBS to win this case. What about the, uh, DPT and the, uh, cyber connections? Sure. So the DPT, uh, uh, connection, it's, it, it's undisputed that the sole connection, uh, well, let me start. It's undisputed that Arbitrator Asimov, um, did, there's no evidence that he knew about this. Um, the theory is that Asimov is that UBS or an affiliate, a non-party affiliate, what has some connection to DPTs 401k plan, but there's no evidence that was a participant in that 401k plans. There's no evidence that he knew that UBS had any relationship with that plan. And UBS wasn't even the sponsor of that plan. The evidence shows was that a non-party UBS affiliate received about $75,000 two to three years before this arbitration ended to find an insurance carrier to be the sponsor for this 401k plan. So again, we're attenuated, uh, uh, connection between his employer and a UBS affiliate, where there's no evidence that he knew anything about it. And again, to go back to the question of the FINRA rule, even if he did know about it, there's no tie by AILA to why that somehow makes him partial in favor of UBS. The fact that he, the fact that a 401k plan that he doesn't, that he's not even a participant in hired UBS and paid them five figures to locate an insurance carrier for that plan, having nothing to do with this arbitration at all. And as for cyber, uh, uh, the evidence shows that UBS, um, held one half of 1% of stock in that company, uh, mostly indirectly. So UBS, uh, again, not a UBS party, a UBS affiliate, uh, own, uh, held shares in an asset, an asset management company called Invesco and Invesco in turn held shares in cyber and putting the math together. That meant that the UBS entity, uh, held less than one half of 1% of the cyber stock. The evidence doesn't even show that UBS held it in a proprietary manner. Uh, and in fact, the entity UBS asset management most likely held it for customers. And so UBS didn't even hold it. Again, there's no evidence that arbitrate there are awesome, even knew, uh, about the owning the, the holding of the shares in Invesco. There's no evidence that he knew of Invesco's shares, um, in cyber. And so none of the, that, that's it. None of those attenuated connections, um, of which he knew nothing about, uh, according to this record, uh, would even give the rise, uh, of an appearance of partiality or bias. They are so far removed, uh, from the substance of this case. Um, and with respect to, uh, DPT and Axiom, uh, he was no longer affiliated with them by the time of the final hearing in this case. And so there's, there's absolutely no theory, um, uh, that could render him, uh, evidently partial. Counsel, what about counsel? What about your, what if we disagree with you? What if we just think he was disqualifiable based on the conflict? You've argued that because the other two arbitrators agreed that, um, we can disregard that. Does the statutory language of the FAA allow that? Statutory language says evident partiality in the arbitrators or either of them. So how can we, if we disagree with you about the one arbitrator with the conflict, how can we nonetheless uphold this? Well, um, to answer the last part of your question first, Judge LaPlante, I would say you could rule for us on, um, either of the two waiver grounds that I've articulated, that we've articulated in the brief and that I can expand upon. However, to answer your specific question about, um, uh, our argument under Fort Hill, I think the statutory language, um, uh, is certainly not clear, um, as to whether it forecloses, um, uh, uh, this at all. First of all, it's not clear whether the either of them applies to the arbitrators or to the earlier part of that subprong of the statute, um, uh, meaning corruption or partiality. Um, uh, but even if it did apply to the arbitrators, all of that is prefaced with the word may that the judge may vacate the conviction. And so there's some, still some element of causality. And I think that there are potentially cases, but not this one where the bias, uh, uh, portrays itself at the hearing itself in a way that evidently affects how the other two arbitrators perceive the case. So you can imagine a biased chairperson who makes evidentiary rulings, um, uh, inappropriate comments during the are actually receiving during the hearing. And perhaps in that instance, the bias of one really does impact the proceeding, but here there's no evidence at all. Uh, again, just sort of taking your honor's hypothetical that, that, uh, which we obviously don't concede that was biased. There's still no evidence at all in this case that that bias, uh, impacted the other two in reaching their conclusion at all. And under the FINRA rules, it's undisputed that you only need a majority, um, um, uh, of the arbitrators to rule in your favor. Now, um, uh, counsel, counsel, what was your client's obligation to determine that these relationships were there so that he could then make a judgment as to whether they not, they should not be disclosed? What, what, I guess speaking, and this is, I think one of the issues that opposing counsel raises that he describes as important and unresolved, what was the burden of your client to, to discover the details of these connections so that they could have been disclosed? Well, I'm not sure that there's a burden on, on the party. I mean, obviously there would be sort of, you know, ethical concerns that I don't believe AILA has, has addressed with respect to UBS or counsel in terms of raising any of this. Um, I, I can say with confidence that UBS and counsel were not sort of sitting on any knowledge themselves of these attenuated connections. I think, um, AILA is arguing that, that, um, that the arbitrator, uh, can I finish answering? Yes. Thank you. That, that the arbitrator has, uh, some, uh, obligation to do so. That was my question. Yes. Oh, I'm sorry. So, so the, the arbitrator, um, uh, in this case submitted, he updated his disclosures twice showing that he was attentive to updating his disclosures. Um, uh, and he had disclosed all three relationships with Axiom DPT and cyber in this case. Um, you know, the fact that between his employer, um, and UBS, and we're talking about, again, two that occurred years before the arbitrate arbitral hearing, um, and this very, very, very minor, uh, um, ownership. Are you saying that in his disclosures, he did disclose connections between himself and these three entities? I want to be very clear. Yes. He disclosed the connections between him and these three entities. Absolutely. He disclosed each one of them and he updated his disclosure. Um, uh, when he returned to Axiom, um, uh, even though he had been at Axiom, uh, uh, in a prior period, but he was just unaware of the connection between the entities and UBS. That's exactly right. And there should be no surprise that he was unaware and, and the, the, the logical inference here from an arbitrator who updates updated his disclosures, given what these attenuated connections are, is that he conducted a reasonable investigation and would not have thought to, um, uh, look for, um, these types of attenuated connections. And that's why courts impose the burden on the parties, particularly in a $70 million case to do their due diligence on arbitration, rather than giving them two bites at the apple, seeing how they do in the arbitration and then bringing the classics or a loser type challenge, which really is what's going on here. Thank you, counsel. Thank you, attorney. First and bomb. You may mute your device at this time and attorney marks, please unmute your device and reintroduce yourself on the record to proceed. Thank you, your honors. Daniel Marks for Appellant Aila. I really just want to make, I just want, just so you know what I think might be important. It would be helpful to me if you could explain why the connections that have now been described between your clients, those various deployments and the connection to UBS, why a reasonable person could see those as evidence of partiality. If you could please address that as part of your rebuttal. Absolutely, your honor. That's where I was planning to start. First of all, I think it's important to dispel the impression that counsel tried to create at the beginning of his argument that this was somehow a battle between two large financial institutions. It wasn't. And so we come to this looking at partiality and whether something is too attenuated from the perspective of my client from Aila, which is a historic non-profit savings association for public sector employees, current and former employees in Puerto Rico. It is not a large financial institution. It does not have a sophisticated investment committee. It does not have a roster of experts who are helping it give advice about the advice it's getting from UBS. It relied on UBS's investment advice and suffered terrible losses, $70 million in losses, which come not just on the balance sheet of some big bank, but from the pockets of working class Puerto Ricans. So from that basis, if you look at Aila as outside of the financial sector, and now they know they have an arbitrator who has these multiple, albeit through employers, multiple connections to one of the world's largest banks and the counterparty of the opposing party in this arbitration, that would be a cause for concern. Now, the reason why it's so important for this court to go back to basics and to decide first principles here is, if we're talking about a mere appearance of bystander, which is what we believe the Supreme Court set down in Commonwealth coding, we think those... We are all really anxiously awaiting an answer to Judge Lopez's question. Your Honor, I think, look, there's no smoking gun here. They say if you don't have the facts, argue the law. If you don't have the law, argue the facts. If the connections were closer, would this be an easier case? Absolutely. But our view is a person with multiple overlapping current connections to the counterparty, to UBS, the party in the case, that's sufficient under FINRA's strict disclosure rules to give the other party an opportunity, just like a defendant going into a trial looking at a jury. Time has expired. That decision may be the most important decision the party makes throughout the entire case. They should have an opportunity to make that with full and complete information. Counselor, you're opposing counsel with the important point that even if these are violations of the FINRA rules, it's the evident partiality standard of the FAA that applies, and the one does not fulfill the other. So how do you... Even assuming it's a violation of FINRA rules, how do you get to the evident partiality standard? Absolutely, Your Excellency, I'm going to give you some much extra time. That's not my argument. My argument is not because it was a violation of the FINRA rules. We're entitled to have a do-over or to have this award vacated. The U.S. Supreme Court said the FINRA rules are highly significant to this analysis. The district court did not consider them. So I think one fair result here would be to go back to the district court with clarification as to what evident partiality means under the FAA and instructions that the FINRA rules need to be considered in the weighing of whether something is too trivial or too attenuated to justify vacature and then do that analysis. It's not that the FINRA rules themselves are dispositive. They're not. That's settled by the Supreme Court, but they're highly significant and they weren't considered here below. Judge Thompson, can I inquire one more? Yes, of course. I want to try to get you back to the statute the same way I asked adverse counsel, right? It sounds like you're basically arguing for two different evident partiality standards, right? Basically, whether it's a neutral or interested arbitrary situation. Am I right? That's right, your honor. So where's the statutory basis for that distinction? Well, I think it's how the Supreme Court interpreted the FAA in commonwealth coding. Now, let me borrow a phrase that this court has used recently in arbitration cases, albeit not about evident partiality. And I won't go in depth because I know two of the justices on this panel were on those cases. But in New Prime and Amazon, this court talked about the concept of herding, where you get this sort of judicial inertia, this accretion of case law, and people stop thinking about first principles. I would recommend perhaps the best decision to answer your question, Judge LaPointe, is the Crow construction case out of the Eastern District of Pennsylvania. One of the only cases I've read that goes all the way back through the case law and just locates where Moralight, an out-of-circuit decision, which was like JCI, a labor case, split off from commonwealth coding and created this notion that you can't reconcile justice, white and black decisions in commonwealth coding, that they in fact have two different standards. And where the judge comes out in Crow construction is, of course, this doesn't have to be monolithic. Of course, you could have a different standard that applies when the parties have agreed by contract to litigate their dispute in front of neutrals. You can only have the partiality or impartiality that you agree to. If you accept partial arbitrators, if you accept some will be industry side, some will be employer side, well, then you can't complain about that after the fact. But if you agree, and the purpose of the FAA, by the way, is not just to promote arbitration, it's to promote the enforcement of arbitration agreements. And here the agreement is to go forward and resolve this dispute in front of neutrals. All the way back to commonwealth coding the FAA, I think the only fair way to interpret the FAA and the way the Supreme Court has is that means a mere appearance of bias, a very low standard, is sufficient to call into question a decision. Keep in mind, commonwealth coding vacated this court's decision affirming on the same ground. So they were very, very careful about maintaining the atmosphere of frankness and neutrality in these situations. Thank you, Your Honors. Thank you. That concludes argument in this case. Attorney Marks and Attorney Furstenbaum, you should disconnect from the hearing at this time.